UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ASHLEY BOUGHTON By her Parent and
Natural Guardian, TAMERA BOUGHTON,

                              Plaintiff,

        v.                                        No.  3: 05-CV-0921

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THOMAS J. McAVOY
Senior United States District Judge

## DECISION and ORDER

        Tamera Boughton ("Ms. Boughton") brought this suit on behalf of her daughter,

Ashley Boughton ("Plaintiff"), under sections 205(g) and 1631(c)(3) of the Social Security Act

("Act"), as amended, 42 U.S.C. sections 405(g) and 1383(c)(3), to review a final

determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's

application for Supplemental Security Income ("SSI") benefits.  Presently before the Court

are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal

Rules of Civil Procedure.

**I.      FACTS**

        **A. Procedural History**

        Plaintiff applied for SSI benefits on October 21, 2003.  Tr. at 18.[1]  The application

was initially denied on February 10, 2004.  Tr. at 36.  On February 18, 2004, Plaintiff

---

[1] " Tr."  refers to the administrative record filed by the Commissioner.

requested a hearing before an Administrative Law Judge ("ALJ").[2]  Tr. at 40.  A hearing was

held on September 28, 2004, where Plaintiff appeared *pro se* before ALJ Harry Barr.  Tr. at

275–91.  In a decision dated December 20, 2004, the ALJ found that Plaintiff's attention

deficit hyperactivity disorder ("ADHD") and borderline intellectual functioning ("BLIF") did not

result in marked or extreme functional limitations and, therefore, did not render Plaintiff

disabled under the Act.  Tr. at 18–28.  The Appeals Council denied Plaintiff's request for

review of the ALJ's decision on June 17, 2005, and that decision became the final

determination of the Commissioner.  Tr. at 5.

Plaintiff then commenced the present action seeking review of the Commissioner's

decision.

### B.  Medical History

Plaintiff was born on January 25, 1997.  Tr. at 45.  Plaintiff has never engaged in

substantial gainful activity.  Tr. at 21, 28.  Plaintiff has a history of upper respiratory and sinus

infections, fevers, asthma, allergies, pharyngitis, skin rashes, and constipation.  Tr. at

163–64, 171, 173–74, 178, 182, 186, 210–12, 217–18, 222, 224, 227–29, 233, 246–47.

However, the record shows that these medical complications have been treated with

medication and are either no longer ongoing or no longer severe.  See id.  The record also

suggests that Plaintiff was physically and sexually abused by her father.  Tr. at 205, 220,

224, 233, 247, 257.  Specifically, Ms. Boughton has reported that Plaintiff, at two months old,

was kicked in the head by her father.  Tr. at 221, 233.  According to Ms. Boughton, Plaintiff

---

[2]The reconsideration stage of the disability claims process was eliminated here because this matter was randomly selected to be a test case for modifications to the disability determination procedures.  See 20 C.F.R. §§ 404.906(b)(4), 404.943; 62 Fed. Reg. 49598–49603, 1997 WL 582652 (F.R.).

was given a brain scan following this incident, where it was determined that Plaintiff would be slow developmentally.  Tr. at 221.

Plaintiff underwent neurological examination by David H. Halpert, M.D., on February 5, 2003.  Tr. at 201–02.  Plaintiff's history shows that she may have experienced–and still possibly experiences–petit mal epileptic attacks, i.e., absence seizures,[3] during which Plaintiff blankly and unresponsively stares for five to twenty minutes. Tr. at 176–77, 201.  According to Plaintiff's history, these absence seizures, or staring spells, originally occurred two to three times per week, but, since 2003, had been limited to two or three times per month.  Tr. at 201.  Dr. Halpert concluded it was unlikely that Plaintiff suffered from actual seizures because: (1) the electroencephalogram (EEG) measurement of Plaintiff's brain activity was normal; (2) the alleged seizures had not been formally diagnosed due to their infrequency; and (3) the staring spells did not have any after-effects, e.g., leaving Plaintiff tired.  See id.  Instead, Dr. Halpert focused on Plaintiff's tics, repetitive head jerking, and eye blinking, noting that Plaintiff's tics and head jerking did not appear to bother her and improved when she wore glasses.  Tr. at 201–02.  Dr. Halpert recommended further evaluation of these tics and the possible existence of ADHD.  See id.

On November 5, 2002, Plaintiff began treatment at the Tioga County Department of Mental Hygiene.  Tr. at 203.  In a March 4, 2003 treatment and discharge summary, Mary Bado, CSW-R, clinical social worker, noted that Plaintiff's motor activity, content of thought, memory, intellect, insight, judgment, and perception were all normal.  See id.  Ms. Bado

---

[3]Petit mal or absence attacks are brief and general seizures that manifest themselves in a 10 to 30 second loss of consciousness, eye or muscle flutterings, or loss of muscle tone.  The period of unconsciousness may be so brief that neither the subject nor observers would be aware of it.  See Taber's Cyclopedic Medical Dictionary ("Taber's"), 562, 15th ed. 1985.

further observed Plaintiff's facial expression, general appearance, flow of thought, mood, affect, and ability to express feelings were appropriate.  See id.  Ms. Bado did note Plaintiff's consistent impulsiveness and anxiousness, excessive speech, and dramatic interview behavior.  See id.  Despite Plaintiff's improved behavior at home and school, Ms. Bado diagnosed Plaintiff with adjustment disorder with mixed disturbance of emotions and conduct, and recommended individual and family therapy.  Tr. at 204.

On March 31, 2003, Plaintiff was admitted into the emergency room at Robert Packer Hospital for treatment of an infection in her right index and middle fingers.  Tr. at 209. The infection resulted from Plaintiff persistently chewing on her fingers.  See id.  Ms. Boughton also reported that Plaintiff exhibited self-abusive behavior at home by cutting her fingernails to make them bleed or by using her fingernails to scratch herself.  Tr. at 233, 245.

On July 8, 2003, Plaintiff was evaluated for educational disability by her school psychologist, Mark Hayman.  Tr. at 233.  First, Mr. Hayman noted Plaintiff's tendency to "mouth back" to adults and to be mean to or hit other children.  Id.  Mr. Hayman's behavioral observations included Plaintiff's weak self-image, difficulty understanding instructions, careless response style, slow adaptation to new tasks, fluctuation of attention and concentration, tendency to be fidgety, restless, impulsive, and hasty, and quick abandonment of efforts–especially with tasks perceived to be difficult.  See id.  However, Mr. Hayman also observed that Plaintiff's manner was cooperative and friendly, that Plaintiff displayed an average activity level for her age, and that Plaintiff did not appear to be tense or anxious. See id.  Second, Mr. Hayman administered two tests on Plaintiff: the Wechsler Intelligence Scale for Children III ("WISC"); and the Wechsler Individual Achievement Test II ("WIAT"). Tr. at 234–35.  In the WISC cognitive assessment, Plaintiff's scores all fell within the

borderline range of functioning, significantly below the age population average, indicating a high susceptibility to distraction.  Tr. at 234.  Based on these results, Mr. Hayman determined that Plaintiff had difficulty with visual inductive reasonsing, a weak numeric reasoning ability, and a depressed working memory.  See id.  In the WIAT, Plaintiff's scores all fell below those of her average grade and school age peers.  See id.  Specifically, the test showed Plaintiff's weakness in the areas of reading and listening comprehension, math concepts and applications, and reading and decoding skills.  Tr. at 235.  Third, Mr. Hayman analyzed two evaluations completed by Ms. Boughton and Ms. Babcock.  See id.  Again, the emerging areas of concern were peer interaction, impulsive behavior, weak listening and reading skills, and inability to maintain focus.  See id. These two evaluations also suggested borderline functioning, especially in the areas of attentiveness, hyperactive-impulsive behavior, and performance of daily living skills.  See id.  Mr. Hayman concluded that "[t]he possible existence of an [a]ttention [d]eficit [d]isorder would seem likely based on these forms."  Id. Mr. Hayman recommended continued pediatric examination and neurological investigation to confirm the existence of an attention deficit disorder.  Tr. at 236.   Based on the appearance of multiple potential disabilities, Mr. Hayman ordered resource room intervention and speech evaluation.  See id.  Finally, having noted Plaintiff's history of mood swings, peer relationship difficulties, and self-abusive behavior, Mr. Hayman recommended that Plaintiff continue receiving mental health counseling at the Tioga Mental Health Clinic and that Plaintiff's family undergo effective home intervention and family-student advisor intervention.  See id.

    Pediatrician Jerry W. Terwilliger, M.D., diagnosed Plaintiff with ADHD on July 23, 2003.  Tr. at 169.  In his evaluation, Dr. Terwilliger noted Plaintiff's tendency to lose focus, not listen, not follow directions, and fight with other students.  See id.  On August 18, 2003,

Dr. Terwilliger again met with Plaintiff due to her inattentiveness and problems in math and

reading.  See id.  Dr. Terwilliger prescribed ten milligrams of Adderall to Plaintiff for her

ADHD.  See id.  Over the next eight months, between September 25, 2003 and May 27,

2004, Dr. Terwilliger increased the dosage of Adderall from ten to thirty milligrams.  Tr. at

163–66.  Dr. Terwilliger and Ms. Boughton began to notice marked improvement in Plaintiff's

behavior coinciding with the Adderall increases.  Tr. at 165 (noting Plaintiff's ADHD was

"better" on February 12, 2004), 166 (noting on September 25, 2003 that Plaintiff was "better

100% in school" and Plaintiff's behavior, curiosity, and inquisitiveness were good).  However,

Ms. Boughton reported Plaintiff was still having "some" defiance, distraction, and behavioral

problems.  Tr. at 163–64, 166.  The last report of Plaintiff's tics came on November 24, 2003

in Dr. Terwilliger's treatment notes.  Tr. at 166.

Plaintiff attended kindergarten during the 2002 and 2003 school year.  Tr. at 79.

Karen Smith, Plaintiff's kindergarten teacher, reported that although Plaintiff's behavior

improved as the year progressed, she struggled academically.  See id.  Due to Plaintiff's

mental and emotional problems, Mrs. Smith and the Waverly Central School District's

Committee on Special Education ("CSE/CPSE") recommended that Plaintiff repeat

kindergarten.  See id.  However, Dr. Terwilliger's treatment notes from the summer of 2003

show Ms. Boughton "insisted" that Plaintiff move on to the first grade.  Tr. at 169.

Consequently, the CSE/CPSE enrolled Plaintiff in supplemental instruction for reading, extra

classroom assistance, and in-class monitoring to assist Plaintiff in the first grade.  Tr. at 145.

On October 6, 2003, Ashley Babcock, Plaintiff's first grade teacher, filed an interim

report assessing Plaintiff's in-class performance.  Tr. at 119.  In the report, Ms. Babcock

ranked Plaintiff's work in spelling, social studies, and science as fair, falling between 70 and

79 on a 100-point scale.  See id.  Plaintiff's reading, arithmetic, and linguistic abilities were listed as weak, falling between 65 and 69.  See id.  Ms. Babcock noted Plaintiff's absence from class participation and inability to finish and turn in work, and underscored Plaintiff's need for "constant help to complete her work."  See id.

In a November 20, 2003 teacher questionnaire, Ms. Babcock evaluated Plaintiff's in-class performance in six domains.[4]  Tr. at 80–87.  Among these domains were: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself; and (6) medical conditions, health, and physical well-being.  See id.  In the first domain, Ms. Babcock found Plaintiff had serious problems reading and comprehending material, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions.  Tr. at 81.  Ms. Babcock also noted Plaintiff's need for constant support to complete work in the classroom, failure to participate in class discussions, and difficulty understanding oral instructions and school and content vocabulary.  See id.  In the second domain, "attending and completing tasks," Ms. Babcock noted a "very serious" problem with Plaintiff's ability to carry out multi-step instructions, along with "serious" problems with Plaintiff's ability to focus on a task long enough to finish it, carry out single-step instructions, complete class and homework assignments, and work at a reasonable pace and finish on time.  Tr. at 82.  Moreover, Ms. Babcock found the frequency with which these problems arose to be hourly.  See id.  Ms. Babcock stressed Plaintiff's

---

[4]These are the same six domains used by the Commissioner to evaluate whether a claimant's impairment or combination of impairments functionally equals a listed impairment.  See 20 C.F.R. § 416.926a(b)(1).

tendency to be distracted or distracting and need for constant reminders to finish her work.

See id.  Ms. Babcock found little to no problem with Plaintiff's ability to organize her things,

sustain attention during play and sports activities, and wait her turn.  See id.  In the third

domain, Ms. Babcock found Plaintiff's ability to relate experiences, tell stories, introduce and

maintain relevant and appropriate topics of conversation, and take turns in a conversation

seriously problematic.  Tr. at 83.  As evidence of Plaintiff's difficulty making, keeping, and

cooperating with friends, Ms. Babcock noted that Plaintiff "often bickers with the other

children" and often plays alone or complains that no one will play with her.  See id.  However,

Ms. Babcock did not find it necessary to implement behavior modification strategies for

Plaintiff because Plaintiff did not have problems obeying adults in authority or expressing

herself clearly and appropriately.  Tr. at 83–84.  Ms. Babcock observed no problems in

Plaintiff's ability to move about and manipulate objects (fourth domain) or in Plaintiff's ability

to care for herself (fifth domain).  Tr. at 84–85.  In the sixth domain, "medical conditions,

health, and physical well-being," Ms. Babcock described Plaintiff's head shaking: "It is a quick

jerk of the head.  The jerk seems to come and go, but gets severe and happens often when

[Plaintiff] is under 'stress.'"  Tr. at 86.  Ms. Babcock lastly noted that Plaintiff was not

experiencing an unusual degree of absenteeism and was continuing to receive support

services in the resource room for one hour per day.  Tr. at 80–81.

On April 29, 2004, Ms. Boughton met with CSE/CPSE for an annual review of

Plaintiff's progress.  Tr. at 108.  The minutes from the meeting reveal that Plaintiff had made

some progress, especially with reading and spelling.  See id.  Plaintiff was experiencing

substantial difficulty in math, particularly when required to differentiate between addition and

subtraction, and as a result, Ms. Babcock had to modify the work given to Plaintiff and then

read the directions aloud to her.  See id.  The other areas of concern were Plaintiff's ability to listen, focus, retain information, and keep up with the regular curriculum.  Tr. at 109.  Based on these continuing concerns, Plaintiff was scheduled to repeat the first grade and continue placement in the resource room, rather than be removed from the general educational environment and placed in an 8:1:1 or 6:1:1 individualized instruction program.  See id.

Dr. Terwilliger referred Plaintiff to Patricia O. Davis, NPP, psychiatric nurse practitioner at the Tioga County Department of Mental Hygiene, to evaluate the possible existence of bipolar disorder based on Plaintiff's mood swings, aggressive behavior, and family history of depression, anxiety, and mental disorders.  Tr. at 245–47.  Ms. Davis performed a psychiatric evaluation of Plaintiff on July 21, 2004.  Tr. at 245.  During the interview, Plaintiff was anxious but not hyperactive, played quietly with the toys in the room, and behaved "appropriate[ly] for her age."  Tr. at 247.   In examining Plaintiff's mental status, Ms. Davis found Plaintiff's speech spontaneous, accompanied by a willingness to interact positively; mood normal, at times anxious; thought processes appropriate to Plaintiff's age and developmental stage; memory good for both recent and remote events; and concentration and orientation to person, place, and time good.  See id.  However, Ms. Davis qualified these findings on the "obvious" possibility that Plaintiff was on her best behavior.  Id.  During this session, Plaintiff admitted to being angry with and hitting other children, but appeared "to have little insight into what is happening with her and her judgement would be questionable."  Id.  Ms. Davis also observed Ms. Boughton's lack of parenting skills and excessive need to receive positive reinforcement from her daughter.  See id.

In her concluding remarks, Ms. Davis first determined that Plaintiff was benefitting

from the Adderall medication.  Tr. at 248.  Ms. Davis assessed Plaintiff's GAF to be 50.[5]  See id.  However, Ms. Davis listed "R[ule]/O[ut] Bipolar Disorder" in her diagnosis.  See id.  Second, Ms. Davis prescribed Seroquel to Plaintiff in an attempt to control some of Plaintiff's anger, sleeping difficulties, and night terrors.  See id.  Third, Ms. Davis recommended play and individual therapy to address Plaintiff's anger issues, coping skills, and ability to socialize positively with her peers.  See id.  Fourth, Ms. Davis suggested that Ms. Boughton could benefit from assistance in parenting and setting limits for Plaintiff.  See id.

The record shows that Plaintiff underwent therapy sessions with Jane Lane, CSW-R, the senior clinical social worker at the Tioga County Department of Mental Hygiene.  Tr. at 254.[6]  On January 24, 2005, Ms. Lane met with Plaintiff and Ms. Boughton to get acquainted and noted that the "meeting took place without incident."  See id.  On February 7, 2005, Ms. Lane attempted to meet with Plaintiff, but Plaintiff's temper tantrum and refusal to go to the playroom without her mother stifled Ms. Lane's attempts.  Tr. at 254–55.  Ms. Lane completed a report of Plaintiff's progress in treatment on May 9, 2005.  Tr. at 256.  In contrast to Ms. Davis' psychiatric evaluation report, Tr. at 245–48, Ms. Lane stated that the diagnosis of ADHD "in no way describes the severity of [Plaintiff's] symptoms and poor

---

[5]The Global Assessment of Functioning, or GAF, represents a mental health clinician's subjective determination of an individual's overall level of functioning according to a 100-point scale, whereby an individual's psychological, social, and occupational functioning are taken into account.  A GAF of 41–50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  See Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 30–32 (4th ed. 1994).

[6]Ms. Lane's reports are only considered here to the extent they relate to the period on or before the date of the ALJ's decision.  Plaintiff underwent therapy sessions with Ms. Lane after the ALJ made his final determination on December 20, 2004.  Ms. Lane's reports were filed with the Appeals Council and thereafter became part of the administrative record.  See 20 C.F.R. §§ 404.970(b), 416.1470(b); see also Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996).

functioning at this time," and that bipolar disorder as a "probable diagnosis . . . more accurately describes" Plaintiff's aggressiveness, mood swings, anger, and poor functioning. Tr. at 256.  Based on observations made while Plaintiff was in play therapy, Ms. Lane concluded that Plaintiff had difficulty learning due to her "marked inability" to stay focused and on task for any length of time, despite her medication.  Tr. at 256.  Ms. Lane further concluded from Plaintiff's increased resource room time and inability to finish a puzzle or painting in her play therapy sessions that Plaintiff needs "a lot of specialized attention and prompting."  Tr. at 257.  The primary focus of Ms. Lane's assessment was on Plaintiff's disturbing interactions and relations with other children and trouble coping with stress.  See id.  Ms. Lane noted Plaintiff's history of disliking and rejecting her classmates: "[t]his is not healthy for her to behave this way for the majority of the time [and] not just on occasion."  Id.  Next, Ms. Lane concluded from Plaintiff's "bizarre reactions and aggressive behaviors" arising in the absence of severe stressors, that Plaintiff would be rendered helpless in dealing with stress created by her chaotic and abusive family situation.  Id.  Finally, Ms. Lane pointed to Plaintiff's failing grades, "extremely poor social interaction with peers," and GAF score of 50 as further evidence of Plaintiff's inability to cope with stress.  Tr. at 257.

In the hearing before the ALJ, Plaintiff had trouble differentiating between her street address, phone number, and hometown.  Tr. at 279–80.  However, Plaintiff was able to respond appropriately to the ALJ's questions regarding her daily activities, medications, and relationships with others.  Tr. at 281–84.  Ms. Boughton discussed Plaintiff's tendency to stay at home, keep to herself, and get sad, frustrated, and angry without reason.  Tr. at 286–88.

**C.  The ALJ's Analysis**

For an individual under the age of eighteen, the Act defines "disability" as a "medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).  The administrative regulations established by the Commissioner require the ALJ to apply a three-step evaluation to determine whether a child qualifies for SSI benefits.  See 20 C.F.R. § 416.924(a); see also Encarnacion ex rel. George v. Barnhart, 331 F.3d 78, 84–85 (2d Cir. 2003).  First, the Commissioner determines whether the child is currently engaged in substantial gainful activity.  See 20 C.F.R. § 416.924(b).  If the child is engaged in substantial gainful activity, she will not be considered disabled.  See id.  Second, the Commissioner determines whether the child has an impairment or combination of impairments that is severe.  See 20 C.F.R. § 416.924(c).  An impairment is not disabling if it is not medically determinable or "is a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations."  Id.  If the child has a severe impairment or combination of impairments, the third step requires the Commissioner to determine whether the impairment meets, medically equals, or functionally equals an impairment listed in Appendix 1, subpart P, 20 C.F.R. § 404.1520(d).  See 20 C.F.R. § 416.924(d).  In determining whether an impairment functionally equals a listed impairment, the Commissioner considers how the child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for herself; and (6) health and physical well-being.  See 20 C.F.R. § 416.926a(b)(1).  In order for an impairment to be functionally equivalent, "it must result in 'marked' limitations in two domains of functioning or an 'extreme'

limitation in one domain . . . ."  20 C.F.R. § 416.926a(a).  A limitation is considered "marked"

if it interferes seriously with the child's ability to independently initiate, sustain, and complete

activities in a specific domain.  See 20 C.F.R. § 416.926a(e)(2)(i).  Where the medical

evidence includes standardized test scores relating to functional ability in a certain domain, a

marked limitation is defined by "scores that are at least two, but less than three, standard

deviations below the mean."  Id.  A limitation is considered "extreme" if it results in *very*

serious interference.  See 20 C.F.R. § 416.926a(e)(3)(i).  An extreme limitation exists where

standardized test scores fall "at least three standard deviations below the mean."  Id.  When

evaluating functional equivalence, the Commissioner must assess the interactive and

cumulative effects of all the impairments supported by the evidence, including impairments

that are not severe.  See 20 C.F.R. §§ 416.924(c), 416.926a(a).  A child will be found

disabled if her impairment or combination of impairments renders her extremely limited in

one domain or markedly limited in two or more domains.  See 20 C.F.R. § 416.926a(a); see

also Encarnacion ex rel. George, 331 F.3d at 84–85.

Applying the three-step test to this case, the ALJ found that Plaintiff had not

engaged in substantial gainful activity since December 31, 2002, the onset date of Plaintiff's

alleged disability.  In the second step, the ALJ determined that Plaintiff's impairments of

ADHD and BLIF were severe because they were more than slight abnormalities and caused

more than minimal functional limitations.  At the third step, the ALJ determined that Plaintiff's

impairments neither met nor medically equaled any impairments listed in Appendix 1 of the

regulations.  The ALJ evaluated Plaintiff's functional abilities in the six domains established

by 20 C.F.R. § 416.926a(b)(1), found Plaintiff's limitations either "less than marked" or non-

existent in each domain, and consequently determined that Plaintiff's impairments did not

functionally equal a listed impairment.  Based on these findings, the ALJ concluded that

Plaintiff was not disabled under the Act.

## II.      STANDARD OF REVIEW

The Court's review of the Commissioner's determination is limited to two inquiries.

See 42 U.S.C. § 405(g).  First, the Court determines whether the Commissioner applied the

correct legal standard.  See Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); Balsamo v.

Chater, 142 F.3d 75, 79 (2d Cir. 1998); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990);

Shane v. Chater, 1997 WL 426203, at *4 (N.D.N.Y July 16, 1997) (Pooler, J.) (citing Johnson

v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987)).  Second, the Court must determine whether the

Commissioner's findings are supported by substantial evidence in the administrative record.

See Tejada, 167 F.3d at 773; Balsamo, 142 F.3d at 79; Cruz, 912 F.2d at 11; Rutherford v.

Schweiker, 685 F.2d 60, 62 (2d Cir. 1982).  A Commissioner's finding will be deemed

conclusive if supported by substantial evidence.  See 42 U.S.C. § 405(g); see also, Perez, 77

F.3d at 46; Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("It is not the function of a

reviewing court to determine de novo whether a claimant is disabled.  The [Commissioner's]

findings of fact, if supported by substantial evidence, are binding.") (citations omitted).  In the

context of Social Security cases, substantial evidence consists of "'more than a mere

scintilla'" and is measured by "'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct.

1420, 1427, 28 L.Ed.2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S.

197, 229, 59 S. Ct. 206, 217, 83 L.Ed. 126 (1938)).  Where the record supports disparate

findings and provides adequate support for both the plaintiff's and the Commissioner's

positions, a reviewing court must accept the ALJ's factual determinations.  See Quinones v.

Chater, 117 F.3d 29, 36 (2d Cir. 1997) (citing Schauer v. Schweiker, 675 F.2d 55, 57 (2d Cir. 1982)); Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990).

The ALJ must give a treating physician's opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Rosa v. Sullivan, 168 F.3d 72, 78–79 (2d Cir. 1999) (citations omitted); Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).  Under this "treating physician" rule, the ALJ must give controlling weight to a treating physician's medical opinion regarding the nature and severity of an individual's impairments if it is well-supported and consistent with the record; but, the ALJ makes the final determination of whether an individual is actually disabled under the Act.  See 20 C.F.R. § 404.1527(e); see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999); but see Balsamo, 142 F.3d at 81 ("[W]hile an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him.") (alterations in original) (internal quotation marks and citations omitted); McBrayer v. Secretary of HHS, 712 F.2d 795, 799 (2d Cir. 1983) ("[T]he ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (citation omitted).

## III.    DISCUSSION

### A.  Substantial Evidence

The ALJ applied the three-step evaluation and found, first, that Plaintiff was not engaged in substantial gainful activity, and, second, that Plaintiff's impairments were severe. See 20 C.F.R. § 416.924(a).  Third, the ALJ found that Plaintiff's impairments did not meet or

medically equal an impairment listed in Appendix 1 of the regulations.  See 20 C.F.R. §

404.1520(d), subpt. P, app. 1.  Neither Plaintiff nor the Commissioner disputes these

findings.  Pursuant to the regulations, the ALJ performed an individualized functional

assessment of Plaintiff in order to make a determination of whether Plaintiff's impairments

functionally equaled a listed impairment.  See 20 C.F.R. § 416.924(d).  In his assessment,

the ALJ analyzed Plaintiff's ability to function in six domains: (1) acquiring and using

information; (2) attending and completing tasks; (3) interacting and relating with others; (4)

moving about and manipulating objects; (5) caring for herself; and (6) health and physical

well-being.  See 20 C.F.R. § 416.926a(b)(1).  Plaintiff does not dispute the ALJ's finding of

no significant limitations in the fourth, fifth, and sixth domains.  Plaintiff contends that the ALJ

ignored substantial evidence showing Plaintiff has "marked" limitations in the first three

functional domains and, thus, erred in finding Plaintiff not disabled.

### 1.  Acquiring and Using Information

In the first domain, the ALJ determined that Plaintiff's ability to acquire and use

information was inhibited by "less than marked" limitations.  The ALJ relied on testimony

provided by Plaintiff's school psychologist, treating physician, teachers, and psychiatric nurse

practitioner to evaluate how well Plaintiff acquires, learns, and uses information.  See 20

C.F.R. § 416.926a(g).

First, Mr. Hayman determined Plaintiff likely suffered from ADHD and BLIF.

Specifically, Mr. Hayman found weaknesses in the areas of visual inductive reasoning,

working memory, reading and listening comprehension, reading and decoding skills, ability to

maintain focus, and math concepts and applications.  Tr. at 233.  Plaintiff's scores on the

WISC and WIAT tests fell significantly below the age and grade population average.  On the

tests administered by Ms. Boughton and Ms. Babcock, Plaintiff's scores fell between one and two standard deviations below average.  Tr. at 235.  For a limitation to be "marked" it must fall "at least" two standard deviations below the average.  See 20 C.F.R. § 416.926a(e)(2)(i).  Although all of Plaintiff's scores consistently fell below the average, they did not fall to the level of two standard deviations.

Mr. Hayman's evaluation and Dr. Terwilliger's treatment notes support a finding that Plaintiff either did not have a marked limitation in the first domain or had a limitation that was reduced to "less than marked" by treatment.  Mr. Hayman's treatment recommendations included resource room intervention, speech evaluation, and family-student advisor intervention.  Tr. at 236.  These recommendations clearly support the existence of an educational disability; however, they do not support the finding of a marked or extreme limitation.  Mr. Hayman's recommendations, considered with Plaintiff's test scores, were reasonably interpreted as steps taken to deal with a "less than marked" limitation.  Dr. Terwilliger confirmed Mr. Hayman's diagnosis, and accordingly prescribed, and gradually increased the dosage of, Adderall to Plaintiff.  Dr. Terwilliger's subsequent treatment notes show that the Adderall brought about significant improvement in Plaintiff's performance in school, especially regarding her inquisitiveness and curiosity.  Tr. at 165–66  Moreover, Dr. Terwilliger's most recent treatment notes mention Plaintiff's continued behavioral problems, but are silent on any continuing problems regarding Plaintiff's scholastic performance and ability to focus and maintain attention.  See id.

The ALJ's determination that Plaintiff's limitations in the first domain were "less than marked" was also supported by testimony provided by officials at Plaintiff's school.  On November 20, 2003, Ms. Babcock evaluated Plaintiff's in-class ability to acquire and use

information and found Plaintiff had "serious problems" reading and comprehending material, expressing ideas in written form, learning new material, recalling and applying previously learned material, and applying problem-solving skills in class discussions.  Tr. at 81.  In response to these problems and Plaintiff's need for constant support to complete her work, Ms. Babcock read directions aloud to Plaintiff, modified the work given to Plaintiff, and emphasized the importance of continued resource room intervention.  Tr. at 108.  Five months later, on April 29, 2004, the CSE/CPSE found Plaintiff was still having difficulties listening, focusing, and retaining information, but reported improvements in Plaintiff's reading and spelling abilities.  Tr. at 108.  As a result, the CSE/CPSE scheduled Plaintiff to repeat the first grade and continue her daily sessions in the resource room.  However, the CSE/CPSE did not recommend that Plaintiff be removed from the general education environment for placement in individualized instruction.

According to Ms. Davis' mental evaluation of Plaintiff on July 21, 2004, Plaintiff's mental condition was much improved: good concentration; age-appropriate thought processes; good memory for both recent and remote events; proper orientation to person, place, and time; and spontaneous speech.  Tr. at 247.  Like Dr. Terwilliger, Ms. Davis concluded from these observations that Plaintiff's Adderall medication was producing positive results.  Tr. at 248.  The report submitted by Ms. Lane contradicted these conclusions: "[Plaintiff] shows marked inability to stay on task or focused for any length of time, despite these medications, making it difficult for her to learn."  Tr. at 256.  Nevertheless, the majority of the evidence in the record, including the opinions of Plaintiff's treating physician, Dr. Terwilliger, and Plaintiff's school psychologist, Mr. Hayman, supports the ALJ's finding of a "less than marked" limitation in Plaintiff's ability to use and acquire information.  See

Quinones, 117 F.3d at 36 ("Where an administrative record supports disparate findings, we must accept the ALJ's factual determinations.") (citation omitted).

In conclusion, substantial evidence supported the ALJ's finding of a "less than marked" limitation of Plaintiff's ability to use and acquire information.  The ALJ gave Dr. Terwilliger's treatment notes controlling weight, Mr. Hayman's evaluation and Plaintiff's test scores proper deference, and the relevant evidence in the record–including Ms. Babcock's teacher questionnaire, Ms. Davis' psychiatric evaluation, and the CSE/CPSE's reports and recommendations–reasonable consideration.

### 2.  Attending and Completing Tasks

In the second domain, "attending and completing tasks," the ALJ found that Plaintiff had "less than marked" limitations.  Here, the ALJ evaluated how well Plaintiff was able to focus and maintain attention; how well, and the pace with which, Plaintiff began, carried through, and finished activities; and the ease with which Plaintiff changed activities.  See 20 C.F.R. § 416.926a(h).

The ALJ began by considering the November 20, 2003 teacher questionnaire completed by Ms. Babcock, Plaintiff's first grade teacher, wherein Ms. Babcock evaluated Plaintiff's in-class performance attending and completing tasks.  Tr. at 82.  Ms. Babcock found Plaintiff's inability to carry out multi-step instructions a very serious problem that manifested itself hourly.  See id.  Ms. Babcock noted "serious" problems with Plaintiff's ability to carry out single-step instructions, focus and refocus on activities, and complete activities on time.  See id.  Ms. Babcock noted that Plaintiff also had clear problems changing activities without being disruptive, completing work accurately and carefully, and being a distraction to herself and others.  See id.  Although Ms. Babcock rated Plaintiff's ability to pay attention

when spoken to as an "obvious problem," she found that Plaintiff had no problem maintaining attention during play and sports activities.  See id.  In her concluding remarks regarding the second domain, Ms. Babcock stressed Plaintiff's need for constant reminders to finish her work and inability to finish class assignments on time.  See id.  Similarly, on October 22, 2003, Ms. Boughton reported that, at home, Plaintiff was able to keep busy on her own and complete her homework, but would not finish things she started or complete her chores without being spoken to multiple times.  Tr. at 53.

Next, the ALJ reviewed Mr. Hayman's psychological report in relation to Plaintiff's ability to attend and complete tasks.  According to Mr. Hayman, the results of the various tests administered to Plaintiff suggested BLIF in the areas of maintaining attention and performing daily living skills.  Tr. at 235–36.  Mr. Hayman's observations included Plaintiff's difficulty understanding instructions, slow adaptation to new tasks, fluctuation of attention and concentration, tendency to quickly abandon efforts, and tendency to be restless, impulsive, and hasty.  See id.  However, Mr. Hayman also noted that Plaintiff "displayed an average activity level for her age."  Tr. at 233.  Based on these findings, Mr. Hayman concluded that Plaintiff likely had ADHD and recommended further medical treatment by Dr. Terwilliger to be accompanied by resource room intervention and speech evaluation.

The ALJ then reviewed Dr. Terwilliger's treatment notes for the period between August 2003 and May 2004–the trial period for Plaintiff's Adderall medication.  Tr. at 164–70. During this period, Plaintiff was still experiencing some defiance, distraction, and behavioral issues.  Tr. at 163.  However, Dr. Terwilliger consistently noted that Plaintiff's ADHD and in-school performance had gotten better.

- 20 -

Ms. Davis' psychiatric evaluation backs up Dr. Terwilliger's impressions.  On July 21, 2004, nearly a year after Plaintiff began taking Adderall, Ms. Davis found Plaintiff was "benefitting from being maintained on Adderall."  Tr. at 248.  Furthermore, Ms. Davis found Plaintiff's concentration good, behavior appropriate for her age–anxious at times, but not hyperactive–and orientation good to person, place, and time.  Tr. at 247.  Although the evaluation report submitted by Ms. Lane to the Appeals Council further highlighted Plaintiff's inability to stay on task and complete assignments, beyond this observation, Ms. Lane's report did not provide any information or conclusions relevant to evaluating Plaintiff's second domain abilities.  Tr. at 257.

The ALJ's finding of "less than marked" limitations in the second functional domain was supported by substantial evidence.  The ALJ concluded from Ms. Babcock's evaluation, Mr. Hayman's recommendations, and Dr. Terwilliger's successful treatment of Plaintiff's ADHD-related problems that Plaintiff's ability to attend and complete tasks improved following medication and resource room intervention.  Although there is evidence in the record showing Plaintiff's limitations may have initially interfered seriously with Plaintiff's ability to independently initiate, sustain, and complete activities in the second domain, whereby a finding of a "marked" limitation would have been required, see 20 C.F.R. § 416.926a(e)(2)(i), the whole record establishes that Plaintiff's ability to attend and complete tasks improved with medication, therapy, and in-school intervention.  The evidence submitted to the Appeals Council after the ALJ's decision merely reiterates the undisputed fact that Plaintiff suffered from some limitations in her ability to complete tasks.  However, there is nothing in Ms. Lane's evaluation to suggest that Plaintiff's limitations were more severe or

impacting than previously diagnosed.  The ALJ's findings in the second domain were supported by substantial evidence.  See Townley, 748 F.2d at 112.


### 3.  Interacting and Relating With Others

The ALJ found Plaintiff's limitations in the third domain were "less than marked." Here, the ALJ evaluated Plaintiff's ability to initiate and sustain emotional connections with others, develop and use the language of her community, cooperate with others, comply with the rules, respond to criticism, and respect and take care of others' possessions.  See 20 C.F.R. § 416.926a(i).

It is abundantly clear from the record and the ALJ's analysis that Plaintiff is severely limited in her ability to interact and relate with others.  The ALJ seems to have based his conclusion that Plaintiff was not markedly limited in the third domain on the following improvements:  Plaintiff "calmed down" as she progressed through kindergarten; Ms. Babcock found Plaintiff able to express her anger appropriately; Plaintiff was referred to as a "friendly little girl" in a CSE/CPSE report; and Mr. Hayman reported that Plaintiff "improved somewhat socially."  Tr. at 79, 83, 158, 133.  However, these shreds of improvement were not enough to reduce an otherwise "marked" limitation to a "less than marked" limitation.  The overwhelming majority of the record supports a conclusion that Plaintiff suffers from a "marked" limitation in the third domain.

Ms. Boughton submitted many documents in which she described Plaintiff's behavioral problems.  In a function report dated October 22, 2003, Ms. Boughton noted Plaintiff's difficulty interacting with other children at school.  Tr. at 51, 53.  Specifically, Ms.

Boughton noted that Plaintiff hit other students in school, locked her teacher and the rest of her class out of the classroom, and repeatedly took other students' bookbags and belongings.  Tr. at 71.  Ms. Boughton noted Plaintiff's desire to play alone and refusal to share toys with other children.  Tr. at 70.  Ms. Boughton also described Plaintiff's mood swings, during which Plaintiff would turn "very mean" or begin to cry without provocation.  Id.

Ms. Babcock's evaluation of Plaintiff's in-class performance mirrored Ms. Boughton's observations.  On October 6, 2003, Ms. Babcock observed that Plaintiff was accepted by her peer group and only disturbed the class occasionally.  Tr. at 119.  However, one month later, Ms. Babcock found Plaintiff had serious problems relating her experiences to others, introducing and maintaining relevant and appropriate topics of conversation, and taking turns in a conversation.  Tr. at 83.  Ms. Babcock categorized Plaintiff's inability to play cooperatively with other children, make and keep friends, seek attention properly, follow rules, and ask permission appropriately as obvious problems.  See id.  Ms. Babcock noticed no problems with Plaintiff's ability to express her anger appropriately, respect and obey authority figures, use language appropriately, and interpret meaning of facial expressions, body language, and sarcasm.  See id.  However, Ms. Babcock noted Plaintiff's tendency to bicker often with her fellow students, and like Ms. Boughton, Ms. Babcock observed Plaintiff playing alone or complaining that no one would play with her.  See id.  The CSE/CPSE report from April 29, 2004, wherein Plaintiff is described as a "sweet . . . friendly little girl who enjoys school," includes no discussion or evaluation of Plaintiff's in-school behavior or interactions with other children beyond one-word descriptions of Plaintiff's behavior as "immature" and social interaction with peers as "fair."  Tr. at 108, 158.

Mr. Hayman reported in July 2003 Plaintiff's tendency to mouth back to adults in her life, difficulty interacting with children, tendency to play by herself, and weak self-image. Tr. at 233.  In his summary, Mr. Hayman noted Plaintiff's peer interactions, mood swings, and impulsive behavior as areas of concern, and recommended further mental health counseling accompanied by home intervention and family-student advisor intervention.  Tr. at 235–36.  Plaintiff underwent therapy with Ms. Davis and Ms. Lane at the Tioga County Department of Mental Hygiene.  Ms. Davis noted that Plaintiff admitted to being angry with, and hitting, other children.  Tr. at 247.  Although Ms. Davis found Plaintiff's mood to be normal, unaccompanied by any suicidal or homicidal ideation, Ms. Davis concluded that Plaintiff "could benefit" from play and individual therapy aimed at addressing Plaintiff's anger, coping skills, and inability to socialize positively with her peers.  Tr. at 248.  Ms. Davis further recommended parenting assistance for Ms. Boughton.  See id.  In May 2005, Ms. Lane reported that Plaintiff "show[ed] the most disturbances as far as interacting and relating to others."  Tr. at 257.  Ms. Lane found Plaintiff directing conversations away from herself, asking questions of the interviewer that went "way beyond social graces."  Id.  Moreover, Ms. Lane noted that Plaintiff often spoke about disliking other children at school and also pointed to Plaintiff's GAF of 50 as a clear sign that Plaintiff was seriously impaired in social functioning.  Based on her first-hand observations and Plaintiff's history of introversion and misbehavior, Ms. Lane concluded "[t]his is not healthy for [Plaintiff] to behave this way for the majority of the time [and] not just on occasion."  Id.

Dr. Terwilliger's opinion did not support a finding of a "less than marked" limitation in the third domain.  In the first and second domains, Dr. Terwilliger's treatment notes supported the ALJ's findings that Plaintiff's ability to acquire and use information, and attend

- 24 -

and complete tasks had improved.  In the third domain, though, it is quite the opposite: Dr.

Terwilliger's notes failed to illustrate any lasting progress.  Dr. Terwilliger's treatment notes

demonstrate Plaintiff's continued behavioral problems despite medication.  Initially, Dr.

Terwilliger noted that Plaintiff's behavior improved when she began taking Adderall.  Tr. at

166.  However, on November 24, 2003, and again on May 12, 2004, Dr. Terwilliger noted

Plaintiff was continuing to have behavioral problems.  Tr. at 164, 166.  Dr. Terwilliger's

observations were reinforced by the other testimony in the record, and consequently should

have been given controlling weight.  See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  The

limited improvements discussed by the ALJ were not sufficient to downgrade what was

clearly a "marked" limitation that seriously interfered with Plaintiff's ability to independently

initiate, sustain, and complete activities in the third domain.  See 20 C.F.R. §

416.926a(e)(2)(i).

    For the above-stated reasons, the ALJ's finding of "less than marked" limitations in

the third domain was not supported by substantial evidence.[7]  Instead, the Court finds that

Plaintiff has a "marked" limitation in her abilities to interact and relate with others.  However,

---

[7]In his decision, the ALJ mentioned Ms. Boughton's failure to comply with Ms. Davis and Mr.
Hayman's recommendations for Plaintiff to undergo further and more intense individual therapy and for Ms.
Boughton to attend parenting classes and family intervention.  The Act provides that if a claimant does not
follow prescribed treatment and fails to provide good reason for failure to do so, the Commissioner will not
find that claimant disabled.  See 20 C.F.R. § 404.1530(b).  Specifically, "a remediable impairment is not
disabling."  Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983) (citations omitted).  Moreover, "[t]he
[Commissioner] is entitled to rely not only on what the record says, but also on what it does not say."  Dumas
v. Schweiker, 712 F.2d 1545, 1553 (2d Cir. 1983).

    In this case, the ALJ properly concluded from Ms. Boughton's failure to provide documentation
showing compliance with medical recommendations that Ms. Boughton did not comply.  However, the ALJ
failed to explain the impact Ms. Boughton's failure to follow recommended treatment had on his decision.
Furthermore, the record provides no medical testimony hypothesizing or stating that Plaintiff's limitations
would be remedied by the recommended treatments.  To the contrary, the record shows that Plaintiff's
relational and behavioral problems did not significantly improve with medication or therapy.  Thus, due to the
ALJ's failure to explain how Ms. Boughton's inaction affected his analysis, the Court finds that Ms. Boughton's
inaction should not have affected the ALJ's third domain findings and proceeds accordingly.

this finding does not alter the ALJ's final determination that Plaintiff is not disabled.  The

regulations require a finding of disability where an impairment or combination of impairments

causes "marked" limitations in two functional domains.  See 20 C.F.R. § 416.926a(a).  Here,

the ALJ found "less than marked" limitations in the first and second domains and no

significant limitations in the fourth, fifth, and sixth domains, all of which the Court affirms.

The Court's modification of the ALJ's findings in the third domain is insufficient to prove

Plaintiff's impairments functionally equaled a listed impairment.  Therefore, the Court agrees

with the Commissioner's determination that Plaintiff's impairments were not functionally

equivalent to an enumerated impairment.    See 20 C.F.R. § 416.924(d).

### B.  Non-medical Evidence in the Record

Plaintiff next argues the ALJ failed to properly consider the non-medical testimony

outlining the signs and symptoms of Plaintiff's uncontrolled anger, adjustment disorder, mood

swings, self-abusive disorder, night terrors and sleep disturbance, and Tourette's syndrome.

The ALJ is required to consider a plaintiff's subjective complaints of pain and other

symptoms.  See 20 C.F.R. § 404.1529(a).  "'In cases where pain or other subjective

symptoms are alleged, the determination or decision rationale must contain a thorough

discussion and analysis of the objective medical and the other evidence, including the

individual's complaints of pain or other symptoms as well as the ALJ's personal

observations.'" Alder v. Apfel, No. Civ. 99-136, 1999 WL 1458368, at *3 (N.D.N.Y. Aug. 13,

1999) (citations omitted).  However, subjective statements about pain or other symptoms are

insufficient to establish disability where they are not supported by or consistent with medical

signs, laboratory findings, and other evidence in the record.  See 20 C.F.R. § 404.1529(a).

In the present case, Plaintiff's difficulty controlling her anger and adjusting to social settings has been considered above within the context of the limitations placed on Plaintiff's functional abilities.  The ALJ properly considered the non-medical testimony regarding Plaintiff's adjustment disorder and anger and his determination was supported by substantial evidence. To the extent that Plaintiff experienced sporadic medical, emotional, and behavioral issues, as reported by her mother, the ALJ properly considered the potential effects of these issues, and either included them in his analysis of Plaintiff's functional limitations or disregarded them where they were inconsequential or were unsupported by or inconsistent with the overall record.

The record shows that Plaintiff suffers from mood swings.  Based on reports from Ms. Boughton describing Plaintiff's mood swings, Dr. Terwilliger and Ms. Davis recommended therapy and prescribed medication–Adderall and Seroquel–to treat these problems.  Although Ms. Lane diagnosed Plaintiff with bipolar disorder based on Plaintiff's "unprovoked aggressiveness and rampant mood swings" and family history, the severity of Plaintiff's mood swings is unclear due to the lack of evidentiary support for Ms. Lane's diagnosis and the inconsistent findings in the record.  Tr. at 256.  Ms. Lane's treatment notes show only two therapy sessions with Plaintiff–one that took place without incident and one that did not occur because Plaintiff was throwing a temper tantrum and refused to participate in the therapy session.  Ms. Lane's findings of bipolar disorder and severer behavioral problems were inconsistent with Ms. Davis' psychiatric evaluation because Ms. Davis ruled out bipolar disorder in her diagnosis and subsequently made no mention of bipolar disorder in her treatment recommendations.  Tr. at 248.  The ALJ relied on Ms. Davis' evaluation; Ms. Lane's reports, which were submitted after the ALJ made his decision, contradicted Ms.

Davis' diagnoses.  Therefore, the ALJ's determination that Plaintiff's mood swings were not in themselves severe must be accepted by this Court because the record supports disparate findings and provides adequate support for the Commissioner's determination.  See Quinones, 117 F.3d at 36.  The Court also points out that Plaintiff's mood swings were included in the ALJ's analysis of Plaintiff's abilities to interact and relate with others in the third functional domain.

The ALJ was correct in finding Plaintiff's alleged self-abusive disorder either non-severe or non-existent.  The record shows Plaintiff was treated in 2003 for an infection in her right index and middle fingers caused by chewing on her fingernails.  Tr. at 209.  Ms. Boughton reported to Plaintiff's school psychologist, Mr. Hayman, that Plaintiff had a tendency to scratch herself with her fingernails when angry.  In the psychological evaluation dated July 8, 2003, Mr. Hayman recommended continued mental health counseling for Plaintiff at the Tioga Mental Health Clinic in order to treat her mood swings.  Tr. at 236. However, there is no diagnosis in Mr. Hayman's evaluation of self-abusive disorder nor is there mention of treatment thereof.  When Plaintiff underwent further counseling at the Tioga County Mental Health Clinic, Ms. Boughton reported to Ms. Davis that Plaintiff would cut or bite her fingernails to make them bleed.  Tr. at 245.  Ms. Davis prescribed Seroquel and recommended individual therapy to control and deal with some of Plaintiff's anger issues.  Tr. at 248.  However, there is no diagnosis of self-abusive disorder.  Plaintiff also underwent play therapy with Ms. Lane at the Tioga County Mental Health Clinic.  However, in Ms. Lane's report there is only a discussion of plaintiff's "bizarre reactions" to stress and no mention of Plaintiff's self-abusive tendencies.  Tr. at 256–57.  There are no laboratory findings or

medical documentation to support Ms. Boughton's claim of the existence of self-abusive disorder.  The record merely supports Plaintiff's tendency to bite her fingernails.

Plaintiff's sleeping impairment was properly categorized as non-severe.  Ms. Boughton reported to Ms. Davis and Ms. Lane that Plaintiff suffers from night terrors and sleep disturbance.  Tr. at 245, 256.  In response, Ms. Davis prescribed Seroquel to help Plaintiff sleep.  Approximately one year later, Ms. Boughton reported that Plaintiff was still experiencing difficult nightmares.  Tr. at 256.  Ms. Lane noted that Plaintiff refused to discuss her dreams, "but is obviously tortured by regular, very disturbing dreams despite medication to promote good sleeping."  Id.  However, Ms. Lane did not increase the dosage of Seroquel or recommend any type of treatment for these sleep disturbances.  Moreover, Ms. Lane's evaluation failed to show that this problem was severe enough to have an impact on Plaintiff's impairments and functional abilities.

Ms. Boughton alleges Plaintiff suffers from Tourette's syndrome.  There is nothing in the record, beyond what Ms. Boughton has reported, to support a finding that Plaintiff suffers from Tourette's syndrome.  There is no medical documentation or laboratory findings illustrating the existence of Tourette's syndrome.[8]

### C. Duty to Develop the Record

Plaintiff's final contention is that the case should be remanded because the ALJ failed to develop the record regarding Plaintiff's alleged, undiagnosed psychological

---

[8]Although tics are a symptom associated with Tourette's syndrome, see Taber's at 679, the medical testimony in the record does not suggest or state a correlation between Plaintiff's tics and alleged Tourette's syndrome.

conditions.   Here, the ALJ fully discharged his duty to develop the record and therefore remand is unnecessary.

Under the Act, the ALJ is required to develop the record if there is reason to believe more information is necessary to reach a full decision.  <u>See</u> 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(d).  In the Second Circuit, this requirement rises to an affirmative duty, whereby "'the ALJ, unlike a judge in a trial, must . . . affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.'" <u>Pratts v. Chater</u>, 94 F.3d 34, 37 (2d Cir. 1996) (quoting <u>Echevarria v. Secretary of HHS</u>, 685 F.2d 751, 755 (2d Cir. 1982)).  This affirmative duty is heightened in cases where a claimant is unrepresented by counsel.  <u>See</u> <u>Pratts</u>, 94 F.3d at 37; <u>see also</u> <u>Cruz</u>, 912 F.2d at 11 ("[W]hen the claimant is unrepresented, the ALJ is under a heightened duty 'to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'") (quoting <u>Echevarria</u>, 685 F.2d at 755 (internal quotation marks and citations omitted)).

When evaluating a claim, the ALJ must make every reasonable effort to obtain all medical evidence.  <u>See</u> 20 C.F.R. § 404.1512(d)(1).  This "every reasonable effort" standard requires the ALJ to make an initial request of the medical source and then, where the source has not complied, make at least one follow-up request and allow for a time extension.  <u>See</u> <u>id.</u>; <u>see also</u> 20 C.F.R. § 416.912(d)(1); <u>Alder</u>, No. Civ. 99-136, 1999 WL 1458368, at *2; <u>Rich v. Apfel</u>, No. Civ. 97-2288, 1998 WL 458056, *11 (S.D.N.Y. Aug. 5, 1998).  The ALJ is authorized to issue subpoenas requiring the production of evidence necessary to deciding a case.  <u>See</u> 42 U.S.C. § 405(d); 20 C.F.R. § 416.1450(d).  In cases involving *pro se* plaintiffs, the ALJ is required to advise the plaintiff on matters regarding missing evidence.  <u>See</u> <u>Suriel v. Commissioner of Social Security</u>, No. Civ. 05-1218, 2006 WL 2516429, at * 4 (E.D.N.Y.

Aug. 29, 2006).  Failure by the ALJ to properly supplement the record by making every

reasonable effort will warrant remand.  See 42 U.S.C. § 405(g).

The reviewing court may remand the case for additional evidence to be taken if and

only if the party moving for remand can show "there is new evidence which is material and

that there is good cause for the failure to incorporate such evidence into the record in a prior

proceeding . . . ."  42 U.S.C. § 405(g).  The Second Circuit has translated this regulation into

a three-pronged standard, whereby

> [A]n appellant must show that the proffered evidence is (1) "'new' and not
> merely cumulative of what is already in the record," Szubak v. Secretary
> of HHS, 745 F.2d 831, 833 (3d Cir. 1984), and that it is (2) material, that
> is, both relevant to the claimant's condition during that time period for
> which benefits were denied and probative, see Cutler v. Weinberger, 516
> F.2d 1282, 1285 (2d Cir. 1975).  The concept of materiality requires, in
> addition, a reasonable possibility that the new evidence would have
> influenced the Secretary to decide claimant's application differently.  See
> Szubak, 745 F.2d at 833; Chaney v. Schweiker, 659 F.2d 676, 679 (5th
> Cir. 1981).  Finally, claimant must show (3) good cause for her failure to
> present the evidence earlier.  See Tolany v. Heckler, 756 F.2d 268, 272
> (2d Cir. 1985) (good cause shown where new diagnosis was based on
> recent neurological evaluation and assessment of response to medication
> required observation period).

Tirado v. Bowen, 842 F.2d 595, 597 (2d Cir. 1988).

In this case, Plaintiff has not provided any reason to conclude that more information

was necessary for the ALJ to reach a full decision, and the record does not independently

support such a conclusion.  See 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. § 416.912(d)(2).  At the

time of the administrative hearing on September 28, 2004, the ALJ had not yet received Ms.

Davis' report.  According to the transcript from the hearing, the ALJ told Plaintiff that his office

would make sure to obtain Ms. Davis' report–which it did the next day as evidenced by Ms.

Davis' report being contained in the record.  Tr. at 245–48, 285.  Furthermore, the transcript

shows that the ALJ had been in contact with Dr. Terwilliger prior to the hearing and obtained all the relevant treatment records.  Tr. at 286.  Finally, near the conclusion of the hearing, the ALJ asked Ms. Boughton if there was anything else necessary to complete the record.  Tr. at 288.  Ms. Boughton responded in the negative and gave no indication that there were any other missing medical records–Ms. Boughton did not mention the treatment records from Ms. Lane because Ms. Lane did not begin treating Plaintiff until January 24, 2005, nearly four months after the administrative hearing and one month after the ALJ made his decision.

The ALJ made every reasonable effort to obtain the missing records.  The ALJ was in contact with Plaintiff's treating physicians prior to the administrative hearing.  At the hearing, the ALJ inquired multiple times about any possible missing evidence.  And after the hearing, the ALJ requested and obtained the missing records.  Therefore, since he produced a complete record, the ALJ fulfilled his affirmative duty "to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  Echevarria, 685 F.2d at 755 (internal quotation marks and citations omitted).

Plaintiff has failed to show that there exists other available evidence that would materially affect the ALJ's determination.  The documents submitted to the Appeals Council regarding treatment after the ALJ's decision, Tr. at 250–74, fail to show there is further unobtained evidence of probative value.  The ALJ noted multiple times in his decision Ms. Boughton's apparent failure to act on the recommendations of the various practitioners contained in the record.  Tr. at 22, 24, 26.  In response, Plaintiff has failed to provide any documentation that these recommendations were followed and has failed to show good cause for failing to provide this documentation or for not following the recommended

treatments.  Thus, Plaintiff has not made the requisite showing or submitted any evidence to warrant remanding this case for further evidence gathering.

## IV.    CONCLUSION

In reviewing disability claims, a district court may affirm, modify, or reverse the determination of the Commissioner with or without remanding the case for a rehearing.  See 42 U.S.C. § 405(g).  Here, the ALJ fully discharged his duty to develop the record and properly considered all the evidence in the record.  The Court's modification of the ALJ's finding in the third domain does not affect the Commissioner's final determination.  The Commissioner's denial of SSI benefits was supported by substantial evidence, and therefore, the Court HEREBY ORDERS that the Commissioner's determination be AFFIRMED.

IT IS SO ORDERED.

Dated: September 20, 2007

Thomas J. McAvoy
Senior, U.S. District Judge